Case number 25-1235, Churchill Downs Technology Initiatives Company v. Michigan Gaming Control Board, et al. Oral argument, 15 minutes per side. Mr. Sands for the appellants. Good afternoon, your honors. May it please the court. Mark Sands, Michigan Assistant Attorney General for the Executive Director of the Michigan Gaming Control Board, Henry Williams, and for Attorney General Nessel. Regulation of gaming is the heart of the state's police power. As such, this court must presume that such authority has not been preempted by a federal act unless that was the clear and manifest intent of Congress. And here in the Interstate Horse Racing Act, Congress did make its intent clear. It made it clear in the first section. It said, one, the state should have the primary responsibility for determining what forms of gambling may legally take place within their borders. And two, the federal government should prevent interference by one state in the gambling policies of another. The district court's order in this case manages to contravene both. What about subsection 3, which is what we're really here to talk about, the limited area of interstate off-track wagering on horse races? That seems like what Congress is intending to regulate here. Right. And in the definitional section, you'll note that interstate horse racing is defined. And it's defined as a legal wager placed or accepted in one state with respect to a horse racing in a third state, potentially, where lawful in each state involved. So there's a threshold question. Is interstate horse racing legal in all of the relevant states? And if it is, then you get into whether or not it's permitted under the Interstate Horse Racing Act. Right. So the question is whether it's legal and under state law. So there are however many states that simply ban the practice, right? Utah, North Carolina, whoever it is. So if you wanted to, it looks pretty clear to me under A1 and under 3001A1 and also that definition of interstate wager that you could say we're not allowing it. So Twin Spires, you're out. Everybody's out. Michiganders, you cannot bet on interstate horse racing using an app or whatever. We can quibble about how narrowly you could do it. But this case is why, accepting all of that, why is there still not at a minimum a conflict preemption problem here? Because you're still targeting the interstate horse race betting industry in a way that seems to contravene at least these consent provisions. We're not, Your Honor, because the state of Michigan is setting a condition precedent within which interstate horse racing is legal. And it's legal if it's done through a Michigan horse racing track that's regulated by Michigan and also through an agreement between that race track and an entity like Twin Spires. Is it your view that the consent provision is a floor and then you can regulate on top of that? I'm not sure I'm catching your meaning. Your opponent's view, as I understand it, says the statute says you have to get these three consents and Michigan's trying to ask for another consent. And your view, as I understand it, is that's okay. We can do this. We can institute this licensing. I don't think you need to get to that part because where we're at is the threshold question of whether it's legal in the state of Michigan, whether this is, in fact, interstate off-track betting. It's not. What you're saying is this statute just has nothing to do with it. Exactly, Your Honor. And the perfect example of how these are different is the Horseman's Benevolent case from this court. There it was clearly legal to engage in interstate horse racing in Pennsylvania and Ohio, the place where the betting occurred and the place where the race was run. So then you're into the Interstate Horse Racing Act. And where Ohio violated the law and where there was a conflict was Ohio attempted to create an additional provision to the IHA that the horseman's veto had to be reasonable. That's not what Michigan is doing. Michigan is saying that this betting is legal under these certain parameters, which is clearly within the state's police power and, in fact, is clearly contemplated by Section 1, that Michigan gets to say how its citizens can gamble on horse racing or anything else within their own borders. I take that provision really to mean, like, if you have a generally applicable gambling provision, like you have to be 21 to gamble or something, I take it you're allowed to do that. But if you're specifically singling out interstate horse racing, which is what you're doing with this licensing requirement, right? You're singling them out and saying you have to do something special beyond what the federal statute requires, which is you have to affiliate with the horse race track and then get this additional permission, which looks to me like it's just a fourth consent requirement. So I guess that's what my hand is. I guess I'm struggling with this, and Judge Nalbanyan was referencing some other states that have banned gambling on horse races altogether, as I understand it. And I guess why isn't the natural implication of your opponent's argument that you cannot do that? In other words, I see their argument, they're going to tell us about their argument, but as occupying the entire field of interstate off-track wagering. And if it occupies the entire field, why does Michigan even get to say, why can't, why can any state prohibit it? And you anticipated part of my argument, Your Honor. When you look at the pervasiveness of the regulatory scheme, it doesn't bear any of the indicia of a regulatory scheme. There's no regulatory agency. There are no administrative rules. There are no rules about what kind of horse racing can be involved with interstate horse racing, whether it's thoroughbred or whether it's harness racing. Whether you can opt into one or whether you can opt into both. Whether you have to be 18 or whether you have to be 21. Whether you, whether if you're a problem gambler and withdraw yourself from your state's, you put yourself on your state's voluntary list of disqualified persons. Is it possible, counsel, to read this statute as distinguishing between accepting wagers and the statutes essentially regulating who gets to accept these wagers on one hand and then placing wagers over here? Is there a distinction? I don't know that there's a distinction. I think what it means is once you as a state have decided that intrastate off-track betting is legal and the parameters under which that's legal, then the IHA applies. Because to hold the opposite again, going back to first principles, the IHA has seven sections. Michigan's Horse Racing Act has 37 sections and 119 pages of administrative rules. It pervasively regulates horse racing in the state of Michigan, and that's important.  Because Congress has recognized through the Wire Act, through UGA, that gambling essentially is a state decision. And if you take it to its extreme, Twin Spires position, Judge Ritz, I think you're right. I think Utah has to allow interstate gaming as long as Kentucky and Oregon agree. And that's inconsistent with the very first section of the IHA. It's inconsistent with the entire body of federal gaming law. That's why I don't think that's necessarily the implication. I think that it's clear. It seems to me it's clear that a state can ban it. I suppose the question is what else can you do short of banning it? I mean, that to me is the question. The field preemption could be narrow. We have all kinds of cases that are, quote, unquote, field preemption cases. But we define the field, not we, but the Supreme Court defines the field so narrowly that it looks more like conflict preemption. So, I mean, that wouldn't be a barrier, it seems to me, to their argument. I mean, your reading of interstate bet or whatever is it has to be lawful in the three states that are involved, right? And I agree with you. I agree. That's the most natural reading of the statute. But I don't think that answers the question of whether there's a conflict or not with this specific requirement, this additional licensing requirement. Because Michigan has placed restrictions on the legality of off-track betting in the state. Some states, for example, some states allow off-track betting in off-track betting parlors, but not in other places. Or some states require people to be over 21. Again, in the IHA, there's nothing that says that the age has to be 18 or 21 or 25 or 40. If Oregon. But I don't understand what is the implication of that argument? Okay, yeah, there's no age requirement. But there are plenty of federal statutes that preempt state statutes that don't cover every single topic that could possibly be covered. Yes, but they have regulatory agencies that do it on behalf of the federal government. They have administrative rules by the federal government that gives guidance for these. There isn't an agency that covers it. You're saying there can't be conflict preemption here because there's no reg that says you have to be 18 to bet on an interstate horse race? I think when you're talking about a presumption of preemption, that is a strong factor in favor of finding that presumption. The fact that this is not, the Interstate Horse Racing Act does not pervasively regulate horse racing. So you look to Congress's intent. And what is Congress's intent? When people in Michigan are placing bets, Michigan gets to decide the scope and the requirements for those bets. That's what the interstate horse racing says. Where? What's the textual hook for that notion? States should have the primary responsibility for determining what forms of gambling may legally take place in their borders. This is a form of gambling. But then there's the provision three, as Judge Mathis pointed out, which walks that back, at least at a minimum. And then, of course, the debate is whether it walks it back altogether. Does Michigan allow interstate horse racing? And if it does, and they're acting according to Michigan's laws relating to the legality of interstate horse racing, then you go to the IHA, and then you look to the additional requirements. The consent of the horse track, the consent of the track where the race is run, and the consent of the Horsemen's Association. And the rules dealing with the distance between off-track betting parlor and the race track, and the number of days where a race is run. But again, I think you have to go back to, first of all, the first principles of state control over gambling, not letting two states interfere with the laws of the state of Michigan. I see my time has expired, and unless this court has any questions. Thank you, Your Honor. Good afternoon. Tom Dupree on behalf of Twin Spires, and may it please the court. The district court correctly held that the Interstate Horse Racing Act preempts Michigan's licensing requirements. This court should therefore affirm the judgment below, including the entry of the preliminary injunction. We believe we are likely to succeed on our argument that Michigan's licensing requirements are preempted, regardless of whether this court takes a field preemption analysis or a conflict preemption analysis. The IHA is a fairly simple… I'm curious about what a state can do short of not allowing interstate horse betting. You agree they could set age requirements. In other words, is the age requirement governed? If I place a bet in Michigan using Twin Spires, am I governed by Oregon's age requirement because the bet is accepted in Oregon, or am I governed by Michigan's? I think in that case, it would be governed by Oregon. Both the IHA… Do you think Michigan can set a minimum age? I'm not sure it could, actually, if we're talking about this narrow field. In other words, if we're talking about interstate… It couldn't require certain disclosures? Your Honor, no. In other words, under the IHA, which in our view preempts the field, Michigan simply has no regulatory role. Can they ban it altogether? Interstate, no. In our view, no, they cannot. The law forces Michigan to allow people in Michigan to use your platform. Well, I wouldn't quite put it that way. For one thing, there are many platforms, but… If they meet the consents, right. In other words, under the IHA, Michigan is, to the extent it is acting in its role as the state from which the wager is placed, simply has no role to play. The only textual hook that my friend gave, and Judge Ritz, when you asked, you said, what is the textual basis for your argument, he quoted the initial high-level philosophy rather than the actual preemptive and substantive aspects of the statute, which I think is telling. That's their textual hook. Is the overarching purpose of this. I think when the court focuses, as it will, on the actual language in the definitional section and the consent provisions, it is clear that the state from which a wager is placed simply was assigned no role and was precluded. Wait, you don't think, you agree they could ban it if they wanted? In other words, Utah bans this. Are you saying that Utah is in violation of the law? We are saying that Utah would not have the right, under our reading of the IHA, to prohibit interstate wagers placed by Utah residents on races that, again, aren't occurring in Utah. We're not talking about intrastate regulation. In other words, that is the traditional role of states, to regulate races in that jurisdiction. We're not talking about that. That's your reading of the definition of interstate off-track wager. There are three states involved in an interstate off-track wager, right? Me, the state that's taking the bet, and the state where the race is happening. I don't agree with that, Your Honor. I think the state... That's in the text of the definition. It says we're lawful in each state involved, placed or transmitted in one state or another. I mean, it seems clear to me that they were contemplating in 1978 or whatever, I'm sitting in New Jersey, and I call Belmont and say, I want to put a bet on affirmed at the Kentucky Derby, right? And so in that case, New Jersey, New York, and Kentucky all have to say, that's an okay transaction. Well, it turns on the meaning of what is a state involved. And in our view, and that language, by the way, Your Honor, that was added as part of the 2000 amendments. That was not in the original. But nonetheless, the point is the same. Our point, Your Honor, is that the states involved means states involved within the meaning of the IHA. States given a consent role. There are two states. The consent provision deals with accepting the wager, and that definitional provision that Judge Nalbanyan was just referring to says placed. We're lawful in each state placed or transmitted. So I guess I'm struggling with, you know, if your argument is that there's preemption with regard to accepting wagers, I feel like that's a better argument than saying that it's preempted with regard to all of the wagering parties. I understand the point, Your Honor. And I guess I would say that for purposes of this case, whichever way the court ultimately comes out of that doesn't make a difference because Michigan allows paramutual wagering on horse races. So as Judge Jarboe analyzed it, she said, you know, Michigan allows paramutual wagering, and once it's flipped that switch, therefore it has consented or, you know, it is lawful in the state involved for purposes of the definitional section. That's how she interpreted it. The motions panel seemingly embraced that reasoning and said it does an admirable job of balancing the interstate and intrastate interests. So I would submit that although I think it's an interesting question, an important question, it's not one that makes a difference in the outcome of this case since Michigan obviously allows paramutual wagering in the state of Michigan. It's lawful in that state involved. Well, it can make a difference if we're talking about the regulation of accepting versus placing. And so I guess let's just roll with me for a moment and assume that I think, okay, you have a pretty good argument on the fact that this statute IHA preempts as to accepting. Why couldn't Michigan regulate the placing of the bet in this specific fashion, saying you cannot place a bet, Michigander, unless you're placing it with a licensed entity under our scheme? Because I think that would just be fundamentally contrary to the whole scheme under the IHA. In other words, it would be very strange if Congress specifically limited two states to having a role in approving interstate wages, but then just somehow said, you know something, but states just want to ban their residents from taking it. That's fine. So it could be shut down nationwide on a state-by-state basis. That would be a very peculiar interpretation of congressional intent. Why wouldn't that be peculiar? Why wouldn't a state be allowed to regulate at least some – I mean gambling creates externalities. So maybe Michigan says, well, I want to make sure that you're 21 when you bet on an interstate horse race, or I want to make sure that you only bet on exactas and we're not going to allow these crazy wheel bets or whatever. I mean there could be a number of things that they – and this impacts Michigan. This impacts whether people get addicted to gambling. All of this is negative toward Michigan. So that's why states have the primary responsibility to define the forms of gambling. So, I mean, they should have some role, it seems to me, or maybe not, in terms of their own state and their own primary conduct in their own state. Well, I don't think so for a few reasons, John. One is that certainly a common law, when we're talking about an interstate wager like this, the common law treats that wager as occurring in the state of acceptance, not in the state in which the wager was placed. When Congress enacted the IHA, of course, it was legislating against the backdrop of that well-settled common law rule, which is to say that, yes, the wager may have been placed for Michigan, but as a legal matter going back, if not decades, centuries in the common law, is that that wager is not occurring in Michigan. That's occurring in another state. So that's point number one. Point number two is just going back to the other point, is that when Congress enacted this limited statute of exceedingly limited scope and Congress did something unusual in that it specified the field that it was intending to preempt, it wanted to allow a national market for interstate horse racing and it wanted to specifically define the roles that relevant states play. Throughout the IHA, Judge Ritz, you're right, it speaks again and again of the state in which the wager is accepted. The wager is accepted. There's not much, if anything, I don't think there's anything, on the state in which the wager is placed. There is in the definition of provision. That is an awfully thin read. In other words, Congress is not in the business of hiding elephants in mouse holes. If it wanted to give the state a fourth consent right, it would not have secretly embedded it in a subclause in the definitional section. It would have put it where one would expect it to place it, at the end of section 3004 where it's specifying, saying the off-track betting platforms, if you want to offer interstate wagers, here are the three consents you have to get. What Michigan is telling the court today is there's actually a secret fourth consent requirement. It has to be approved under Michigan law, and you reach that conclusion by looking at the subclause in the definitional. That makes no sense. That's not how this court reads statutes. But it's not an elephant in a mouse hole as far as I'm concerned. I mean, it's a line drawing issue. And I understand you disagree with this, but if I think that the three states involved include Michigan, and there's a legality question, and that they have some role in defining what's legal in their own state, the question is requiring you to place a bet with somebody that has this license, if they say that makes it illegal, and we're simply reading what the definition says, and that's our definition of legality. I mean, that to me is not implausible. Now, do I think it runs up against, does it look like a consent requirement, or that you're specifically singling out interstate horse racing, horse betting with an additional requirement that looks like the same kind that we already have? Yes. So I think maybe there's a conflict. But I don't think it's crazy to say we're just parsing what it means to make something illegal within the state. I understand the argument, Your Honor, and I agree with your point that there still would be a conflict. So I would hope that even if the court is not inclined to find field preemption, which we think it should, that was the basis, of course, in which Judge Jarboe resolved the case, that there is, I think, an absolutely indisputable conflict here, in that Congress said what is set forth in the IHA are the exclusive requirements for being allowed to accept interstate wagers. They established three consent requirements. What Michigan is trying to do here is basically to say, as Your Honor articulated, well, we've got our own licensing requirement that you also have to comply with. And that's not – Well, the statute doesn't say exclusive. We need to be precise, right? That provision says may be accepted by a system only if consent is obtained from. And I understand your point. You think that that's essentially defining the three consents and nothing else can be set. It doesn't say exclusive. I interpret the only if as exclusive, and I also interpret – Necessary, but why not necessary but not sufficient, you know, but a state can add something else. Well, because there is also the provision, Your Honor, where it begins by prohibiting any sort of wagering and saying thou shalt not engage in interstate wagering except as specified herein. Right. You have to do these three things. You have to do these three things, and then you can do it. In this state, you have to do another. Well, see, that's where I part ways. In other words, I do not think it is a reasonable or natural reading of the statute to say, and you also have to comply with Michigan's licensing requirement, putting all of that weight onto that one word, that one definitional phrase, which, again, we don't think even applies to Michigan. We don't think there is a state involved for purposes of the IHA, but I don't think it's a common-sense, natural reading of what Congress was doing here. It would be inconsistent certainly with the common law. It would be inconsistent with how other courts have interpreted this statute, well, how this court interpreted the statute in the Horstman's Benevolent case. To go back to one of the initial points, you do think it's a reasonable reading of this statute that it prohibits Michigan from prohibiting this betting? Correct. And so in Utah and North Carolina and anywhere else. Could Michigan say, you know, we don't want anyone under the age of 13 to place interstate off-track bets, wagers? Your Honor, well, first I would say that's not this case, but number two, I would say actually I don't think they could. In other words, if you read the statute as we do to preempt the field, that simply leaves no role for state regulation. I appreciate this. I'll be frank. From the briefing, I thought this was the implication of your argument, and so I appreciate you leading with your chest. And I embrace it fully. I think that's absolutely the correct reading of the statute. And I would say it's not unusual. I mean, certainly there are contexts in which Congress, particularly when it's exercising its interstate commerce authority, simply decides to preempt the field. And to be sure, they don't have a regulatory agency to enforce this. They don't have a finely reticulated 400 pages in the federal register with every jot and tittle. Absolutely. But that's not required for preemption. No court's ever said that. So I think this statute is actually really a model of how the Congress, when it is confronted with one of these intractable problems, if you've got actors in seven different states all trying to regulate and claim a share of a transaction, that Congress set out what up until now, at least, have always been very clear rules about saying you get the three consents and you're good, you can accept these wagers. That's how all the courts have understood the IHA until Michigan says, well, actually you have to comply with our licensing requirements too. That's not the scheme that Congress designed. It just seems odd to me that your client is willing to not do business in places like Texas. There's a lot of money out there that you're leaving on the table. Well, look, I mean, I think the decision whether to go into a state can depend on a variety of factors, the business climate, the regulatory climate, the legal climate. You know, we do not operate in all states. That is true. But, again, I think that in this case, I think what is happening is that Michigan is trying to do what Ohio tried to do in that Horseman's Benevolent case, where they're basically trying to supplement or add on to the federal scheme. That's exactly the vice that this court discerned in the Horseman's Benevolent case, where they said this is the exclusive structure Congress designed. States can't tamper with it, even if that includes adding or supplementing or putting their own regulatory layer superimposed on the statute. They can't do that. That's what this court said. I thought in that case the Ohio provision was essentially undermining one of those required consents. Am I misreading it? Well, I guess it depends on your perspective if it undermined it or, you know, enhanced it. You know, what this court perceived as the flaw was that they said Ohio, and I believe the word was supplement. In other words, they said you can't supplement the requirements that are in the IHA. And when they were talking about the IHA requirements, they were talking about the well-settled three consents. You know, IHA cases, of course, have been litigated for decades. To my knowledge, no federal court has ever, ever accepted this argument that a state can superimpose its own consent requirement, its own licensing requirement. No court has ever accepted that argument. And it would be inconsistent, I think, with what this court said in Horseman's Benevolent. You can't supplement. I mean, we can argue about whether or not it's a, you know, a helpful supplement or detracts or conflicts, but it's a supplement. There's no question about that. That can't be disputed. So under a straightforward application of what this court held in Horseman's Benevolent, it's preempted. Okay. Thank you, Mr. Dupree. We'll hear from that over. The implication of their argument is breathtaking. For the first time, they argue that this court should hold that every state in the union must participate in interstate horse racing. If Utah finds it's against their public policy. I'm not sure we can hold that. I absolutely agree. That's his, I mean, I'm not saying as a mechanical matter we can make anybody do anything. I mean, we've got the case in front of us. That certainly is the implication of his argument, and he's said it out loud. Yes. He said outright that the Congress intended to force every state in the union to participate in gambling. That is contrary to every application of gambling by the federal government. It's contrary to the Murphy case. Where the Supreme Court said Congress can't ban gambling outright in each state because it's a state-by-state decision. It's inconsistent with the Office of Legal Counsel's opinion that we can't impose a national lottery because it's inconsistent with some state's public policy. It's inconsistent with the stated intent of this act that states have primary responsibility to determine what forms of gambling will go on in their state. Next, I think he makes an interesting point. Well, Michigan allows parimutuel racing, and that's true, and they do it through a statute. They do it through a legal process that says you can engage in parimutuel racing if you do it at a licensed horse track. And that's part of the legality. When you go to the operative section, Section 303, an interstate off-track wager may be accepted when? Well, what's an interstate horse racing wager? We know it's that definition where it's legal where it's placed, it's legal where it's accepted, and it's legal where the race is run. And once those three legalities come into play, then you get into the consents because you need more than just that. You could have a legislature that says, yes, we want interstate horse racing. And you have a horseman's association like in Ohio that says, we don't think so, at least not at this rate. But we're not at the consents. They want it to be the consents because they want that definition that dooms their case to go away. That definition can't go away because it's only legal to engage in off-track betting in Michigan if it's done pursuant to the Michigan Horse Racing Act. That's been Congress's clearly stated intent in this law. That's how Congress has interpreted things in the Wire Act where the transmission of information has to be lawful where it's sent from and where it's received. It's the same under UGIA where the information has to be transmitted and then received. And I would posit that you have a Wire Act because of cases like the Telegraph case that they and the district court relied on. Where you have a seeming loophole and Congress closed that loophole because gambling is a heavily regulated industry. And the people of the state of Michigan deserve their government to regulate that industry, not Oregon and Kentucky. Thank you, Your Honor. Thank you both for your arguments and your briefs. The case will be submitted.